**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SYNTHIA G. ROSS, *et al.*, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case no.: 1:09-CV-5695 |
| | ) ) | Judge Joan Lefkow |
| v. | ) ) | Magistrate Judge Maria Valdez |
| RBS CITIZENS, N.A., d/b/a CHARTER ONE, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER THE
ILLINOIS MINIMUM WAGE LAW**

Nigel Telman (Ill. Bar No. 6216939)
Catherine J. Spector (Ill. Bar No. 6287459)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Tel: 312.962.3550
Fax: 312.962.3551
ntelman@proskauer.com
cspector@proskauer.com

Mark W. Batten*
Alison Langlais*
One International Place
Boston, MA 02110
Tel: (617) 526-9600
Fax: (617) 526-9899
mbatten@proskauer.com
alanglais@proskauer.com

Elise M. Bloom*
Amanda D. Haverstick*
Jacqueline Dorn*
1585 Broadway
New York, NY 10036
Tel: 212.969.3000
Fax: 212.969.2900
ebloom@proskauer.com
ahaverstick@proskauer.com
jdorn@proskauer.com

*Admitted *pro hac vice*

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

I      INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................1

II     FACTUAL BACKGROUND......................................................................4

     A.    The Charter One Network in Illinois ..............................................4

     B.    Policies On Time Recording and Overtime ..................................5

     C.    The Proposed Class Representatives ............................................5

     D.    The Significant Variation In How ABMs Spend Their Time......................7

III    ARGUMENT ........................................................................................8

     A.    PLAINTIFFS BEAR THE BURDEN OF SATISFYING THE RIGOROUS REQUIREMENTS OF RULE 23..........................................8

     B.    PLAINTIFFS CANNOT PROVE ADEQUACY UNDER RULE 23(a)(4) BECAUSE ROSS AND KAPSA LACK CREDIBILITY AND INTEGRITY. .................................................................................9

     C.    THE ABM CLASS SHOULD NOT BE CERTIFIED. ............................12

           1.    Plaintiffs Cannot Satisfy Rule 23(a)(3) Because Kapsa's Misclassification Claim Is Not Typical of the ABM Class. ..........13

           2.    Plaintiffs Do Not Satisfy Rule 23(b)(3) for the ABM Class..........14

     D.    THE HOURLY CLASS SHOULD NOT BE CERTIFIED......................17

           1.    Plaintiffs Do Not Satisfy Rule 23(a)(3) Because Neither Ross Nor Kapsa Has Claims Typical of the Hourly Class.............................18

           2.    Plaintiffs Cannot Satisfy Rule 23(b)(3). ........................................20

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acosta v. Scott Labor LLC,*
2006 WL 27118 (N.D. Ill. Jan. 3, 2006) ...................................................................23

*Adair v. Wisconsin Bell, Inc.,*
2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ..........................................................25

*Austin v. Cuna Mut. Ins. Soc'y,*
240 F.R.D. 420 (W.D. Wis. 2006) .............................................................................17

*Brider v. Nationwide Credit Inc.,*
1998 WL 729747 (N.D. Ill. Oct. 14, 1998) ...............................................................10

*Bunyan v. Spectrum Brands, Inc.,*
2008 WL 2959932 (S.D. Ill. July 31, 2008) ..............................................................16

*Burkhart-Deal v. CitiFinancial, Inc.,*
2010 WL 457122 (W.D. Pa. Feb. 4, 2010) ................................................................24

*Cerbu v. Chicago Bldg. Servs., Inc.,*
1999 WL 438905 (N.D. Ill. June 22, 1999) ...............................................................21

*Diaz v. Electronics Boutique of Am., Inc.,*
2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ..........................................................25

*East Texas Motor Freight Sys., Inc. v. Rodriguez,*
431 U.S. 395 (1977) .....................................................................................................9

*Edwards v. Publishers Circulation Fulfillments, Inc.,*
2010 WL 2428083 (S.D.N.Y. June 16, 2010) ...........................................................16

*Gen. Tel. Co. v. Falcon,*
457 U.S. 147 (1982) .................................................................................................8, 9

*Helm v. Alderwoods Group, Inc.,*
2009 WL 5206207 (N.D. Cal. Dec. 29, 2009) .....................................................21, 24

*Hernandez v. Gatto Indus. Platers, Inc.,*
2009 WL 1173327 (N.D. Ill. 2009) ...........................................................................23

*In re Bridgestone/Firestone, Inc.,*
288 F.3d 1012 (7th Cir. 2002) .....................................................................................8

*In re Evanston N.W. Healthcare Corp. Antitrust Litig.,*
2010 WL 1488027 (N.D. Ill. Apr. 12, 2010) ...........................................9, 14, 15, 23

*In re Wal-mart Wage and Hour Employment Practices Litig.*,
2008 WL 3179315 (D. Nev. June 20, 2008)................................................24

*Kaplan v. Pomerantz*,
132 F.R.D. 504 (N.D. Ill. 1990)................................................12

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*,
2000 WL 1774091 (N.D. Ill. Dec. 11, 2000)................................................23

*Livingston v. Assocs. Fin., Inc.*,
339 F.3d 553 (7th Cir. 2003) ................................................9

*Mace v. Van Ru Credit Corp.*,
109 F.3d 338 (7th Cir. 1997) ................................................13

*Novak v. Home Depot U.S.A., Inc.*,
259 F.R.D. 106 (D.N.J. 2009) ................................................16

*Odem v. Centex Homes*,
2010 WL 424216 (N.D. Tex. Feb. 4, 2010)................................................16

*Oetinger v. First Residential Mortgage Network, Inc.*,
2009 WL 2162963 (W.D. Ky. July 16, 2009) ................................................16

*Piscione v. Ernst & Young L.L.P.*,
171 F.3d 527 (7th Cir. 1999) ................................................16

*Pope v. Harvard Bancshares, Inc.*,
240 F.R.D. 383 (N.D. Ill. 2006)................................................9, 10, 12

*Puffer v. Allstate Ins. Co.*,
255 F.R.D. 450 (N.D. Ill. 2009)................................................8, 14

*Reich v. Homier Distrib. Co.*,
362 F. Supp. 2d 1009 (N.D. Ind. 2005) ................................................17

*Roe-Midgett v. CC Servs.*,
512 F.3d 865 (7th Cir. 2008) ................................................16

*Saleen v. Waste Mgmt., Inc.*,
649 F. Supp. 2d 937 (D. Minn. 2009)................................................25

*Searcy v. eFunds Corp.*,
2010 WL 1337684 (N.D. Ill. March 31, 2010) ................................................10

*Szabo v. Bridgeport Machs., Inc.*,
249 F.3d 672 (7th Cir. 2001) ................................................8, 9

*Thorogood v. Sears, Roebuck and Co.*,
    547 F.3d 742 (7th Cir. 2008) ................................................................8

*Velasquez v. HSBC Fin. Corp.*,
    266 F.R.D. 424 (N.D. Cal. Feb. 18, 2010) ..............................................25

*Walker v. Bankers Life & Cas. Co.*,
    2008 WL 2883614 (N.D. Ill. July 28, 2008) ....................................14, 17

*Yon v. Positive Connections, Inc.*,
    2005 WL 628016 (N.D. Ill. Feb. 2, 2005) ..............................................23

## STATUTES

29 U.S.C. § 207(a)(1) ...........................................................................21

## OTHER AUTHORITIES

29 C.F.R. 785.47 ..................................................................................22

Federal Rule of Civil Procedure 23 .................................................. passim

## I    INTRODUCTION AND SUMMARY OF THE ARGUMENT

Attempting to bootstrap their Illinois Minimum Wage Law ("IMWL") claims onto their conditionally certified FLSA claims, and inaccurately describing their burden of proof under Federal Rule of Civil Procedure 23 as "not onerous," Plaintiffs now move for class certification on their IMWL claims – as if the standards under Rule 23 and the FLSA were the same. They are not, and Plaintiffs come nowhere close to meeting the Rule 23 standards.

This action was brought by two former Charter One employees, Synthia Ross and James Kapsa, whose Illinois employment was terminated for malfeasance in February 2007 and September 2009, respectively. Their action asserts both IMWL and FLSA claims, but the current motion involves only the IMWL claims. Plaintiffs seek certification under Rule 23(b)(3) for two distinct IMWL classes: one to be represented by Kapsa, on behalf of current and former exempt Assistant Branch Managers ("ABMs") in a claim for misclassification (the "ABM Class"); and a second to be represented by Kapsa and Ross, on behalf of current and former nonexempt employees, who assert a variety of "off-the-clock" claims (the "Hourly Class").

If certified, the combined classes will likely comprise over a thousand individuals, the fates of whom will rise or fall with Kapsa and Ross, unless they take affirmative steps to opt out. Rule 23 recognizes the gravity of this possibility and imposes rigorous requirements on Plaintiffs. These requirements, contrary to Plaintiffs' claim, are in fact "onerous," and they differ considerably from the lenient first-stage conditional certification standards under the FLSA. The requirements of Rule 23(a) ensure that the proposed class representatives – a role this Court has termed a "fiduciary" one – are individuals who can act with integrity and credibility, and who can advance claims that are characteristic of the class. Only if these standards are met can the due process rights of absent class members, and of defendants, be protected. Plaintiffs here cannot satisfy Rule 23(a). Both Kapsa and Ross were fired for

integrity violations, and both submitted sworn statements in this action that they were forced to retract as untrue. Both also had a-typical employment circumstances at Charter One, and they admit that those circumstances form the factual predicate for the overtime hours on which they base their individual claims. These factors make both Kapsa and Ross inadequate class representatives and preclude Plaintiffs from satisfying Rule 23(a).

Plaintiffs likewise fail to satisfy the demanding standards of Rule 23(b)(3), which require them to present "affirmative evidence" to demonstrate a method by which they can establish class-wide liability with common proof. Plaintiffs cannot do that here, because all of their claims necessarily arise from individual circumstances that vary from employee to employee and branch to branch. With respect to the misclassification claims of the ABM Class, there was no policy requiring that all ABMs perform the same management duties or spend a prescribed percentage of time on exempt duties. What ABMs actually did varied from branch to branch and day to day – as Kapsa's own testimony demonstrates. How each ABM spends his or her time, and thus whether he or she is properly classified, can only be individually determined. Plaintiffs' misclassification claims are therefore not subject to class-wide proof and should not be certified.

The off-the-clock claims of the Hourly Class similarly depend on individualized evidence. Plaintiffs admit that Charter One's official overtime policy – the only common evidence – is lawful: all nonexempt employees must record all time worked, including overtime, and all must be paid for it. Indeed, Kapsa, Ross, and many other putative class members were in fact paid for substantial amounts of overtime. Plaintiffs' off-the-clock claims are premised on a series of individual claims that specific managers deviated from official policy. Plaintiffs' own testimony establishes how individualized these claims are:

- Kapsa claims that no overtime at all was permitted by one of his managers, but that another one paid for overtime regularly;

2

- Ross claims that up until her last branch manager (during her last month of employment), up to <u>1-2 hours</u> of overtime was permitted per week (and she was paid for such time), but that overtime beyond that was not permitted; and

- Several current employee-declarants state that <u>all hours</u> of overtime are permitted and paid for in their experiences, and that they have always been paid for all time worked.

There is simply no common, uniform policy to deny overtime at Charter One, and Plaintiffs have no evidence to show one. Therefore, the proof needed to establish the claims of individual class members will not be common. Moreover, despite the seemingly large volume of declarations Plaintiffs have submitted with their motion, all of the plaintiff-declarants deposed thus far have admitted that their statements are inaccurate – they actually have no personal knowledge as to "all" employees, and even for the limited number of employees with whom they worked and claim to have knowledge, declarants have no actual proof to advance anyone's claims except their own. Plaintiffs have also admitted that many of their sworn statements are downright false. The "evidence" Plaintiffs attach to their motion thus does nothing to satisfy the affirmative showing required that there be class-wide proof and a mechanism to prove liability class-wide.

Instead, whether each individual employee actually failed to record all time worked in a week, and, *if so*, whether the unrecorded hours were overtime hours, and, *if so*, whether the employee's manager was aware of it, and, *if so*, whether the employee was unlawfully denied payment for that time, are just some of the critical elements of each Hourly Class member's claims that would have to be decided individually. Finding any common proof to establish class-wide liability would be a virtual impossibility.

Class actions permit the jury to attribute findings it makes with respect to the named plaintiffs to all absent class members. If, however, a jury must decide issues specific to each individual in the class before reaching a decision on each individual's liability – as would

3

overwhelmingly be necessary here – the action devolves into individualized mini-trials, in contravention of the efficiencies and economies of scale envisioned by Rule 23. Accordingly, the Court should deny Plaintiffs' motion and decline to certify either the ABM or Hourly Class.

## II       FACTUAL BACKGROUND

### A.       The Charter One Network in Illinois

"Charter One" is a brand name of Defendant RBS Citizens, N.A. that operates retail banking branches in Illinois. *See* Ahn Exs. 2-5, 8.[1] Branches are organized into regions, and each Regional Manager has authority over the region's budget for overtime. Cmd.II.A ¶ 3; Ahn Ex. 5. Currently there are seven regions – six "traditional" and one "in-store" – and there are 88 traditional and 14 in-store branches. Cmd.II.A ¶ 4.

Traditional branches are freestanding buildings or separate units in a city block or strip mall, whereas in-store branches are housed inside another retail establishment, such as a Wal-mart or supermarket, and they are smaller and have less customer traffic. *Id.* ¶ 5; *see* Kapsa Tr. 8. Under the Branch Manager, traditional branches typically employ one or two ABMs, one or two Teller Managers, and several Tellers and Bankers, whereas in-store branches typically employ one ABM and only 2-4 Bankers. Cmd.II.A ¶ 6; Kapsa Tr. 18, 136.

- A <u>Branch Manager</u> ("BM") is an exempt employee in charge of managing all aspects of the branch's operations and supervising (directly or indirectly) all of the branch's employees.
- An <u>ABM</u> is an exempt employee who supervises (directly or indirectly) certain branch hourly employees (as well as performs other managerial tasks – *see* Cmd.I.A).
- A <u>Teller Manager</u> ("TM") is a nonexempt employee who directly supervises Tellers (as well as performs other managerial tasks – *see* Cmd.I.B).
- A <u>Teller</u> is a nonexempt employee who mainly conducts customer credit and debit transactions.

---

[1] Deposition Transcripts and Exhibits, included in Defendants' Compendium ("Cmd.") § III, are cited as "[Last Name], Tr./Ex. __." Evidence Summaries and Declarations are in Cmd. §§ I and II, respectively, and are cited by Cmd. Index number; the Second Amended Complaint is cited as "SAC ¶ __"; and Plaintiffs' Memorandum in support of their motion, and Exhibits thereto, are cited as "Pl. Br./Pl. Ex. __."

- A <u>Banker</u> is a nonexempt employee who is generally responsible for marketing bank products to customers. In-store and Traditional Bankers have different job descriptions and different duties, including that only in-store Bankers perform Teller functions.

Cmd.II.A Ex. 1; Kapsa Tr. 18, 136.

**B.     Policies On Time Recording and Overtime**

Plaintiffs admit that Charter One maintains lawful formal policies for time recording and overtime. Cmd.I.E. Under those policies, all employees must record all hours worked and must be paid for all hours worked, including hours over 40/week at a time-and-a-half rate. Kennedy Tr. 70 & Ex. 6. The specific time entry process since 2006 has been computer-based. *Id.* 26. Either a BM or ABM reviews and approves each week's hours before submission to payroll. *Id.* 66. Managers may modify a time entry to correct inaccuracies, such as if an employee records a start of 9 a.m. despite arriving at 10 a.m. *See id.* 67, 70. Since 2008, any manager change triggers an e-notice to the employee, who can "accept" or "reject" it before submission to payroll (though employee is always paid for the week even if change is "rejected"). *Id.* 92-95; *see* Rowe Tr. 64-65 & Ex. 4. It is undisputed that hourly employees, including Ross, Kapsa, the opt-in plaintiffs who were deposed, and many others, were paid for significant amounts of overtime during the class period. Cmd.I.E.

**C.     The Proposed Class Representatives**

***Synthia Ross.*** Ross commenced employment at a predecessor to Charter One, as a Teller at the Beverly traditional branch, and in 2005, she was promoted to TM, a position she held throughout her Charter One employment. Ross Tr. 15-16, 52-53. As TM, Ross oversaw "every aspect of what [the Tellers] did," and had many operational responsibilities. Cmd.I.B.

Ross's employment was terminated on February 10, 2007, (less than four months into the class period, which starts October 23, 2006), when Charter One determined that she was a risk to the branch based on her inability to account for and balance her currency. Ross Tr. 15, 53, 56.

5

In the weeks leading to her discharge, Ross had significant balancing problems, including being $20,000 off one day. *Id.* 54-55. Ross understands that such a balancing deficiency poses a serious issue with respect to integrity. *See id.* 55-57.

***James Kapsa.*** Kapsa commenced Charter One employment on March 26, 2006 as an ABM at the St. Charles in-store branch. SAC ¶ 55; Kapsa Tr. 8, 149. He claims that the branch was almost always understaffed (at times extremely so), and that he and the Bankers he supervised worked more than 40 hours per week "because" the branch was so short-staffed. Kapsa Tr. 18, 20, 93, 153. Six months after his start, in or around September 2006, the BM departed and there were 3-4 months when Kapsa served as "Acting Branch Manager," during which time he assumed all BM functions:

> if there were responsibilities [the BM had] that I didn't assume, I didn't know
> of them. . . I would imagine I assumed them all. . . . I basically ran the branch.

*Id.* 26-27, 33-35. As ABM, moreover, Kapsa testified he regularly performed the exempt management tasks that Charter One considered to be most important to his role – including: 1) supervising hourly employees, 2) performing operational tasks, and 3) regularly performing Branch Manager. Cmd.I.A. The tasks attested to by Kapsa are consistent with the ABM job description, which provides that the ABM has "overall responsibility for daily operations, including management of Teller (including TM) and Customer Service [i.e., Banker] staff," and is responsible for a long list of exempt supervisory and managerial tasks. Ahn Ex. 7.[2]

After his year as an ABM, in or around March 2007, Kapsa enrolled in a one-year trainee program elsewhere and became a part-time, hourly Banker, during which time he worked only 1-2 days a week and no overtime. Kapsa Tr. 9-13, 37-38, 41. In April 2008, Kapsa resumed full-time status, continuing as a Banker at St. Charles; he remained there until April 2009, when he

---

[2]The testimony of opt-in plaintiff Droughns, and the declarations of several other ABMs, confirms that ABMs actually and regularly perform all of the exempt tasks in the job description. *See* Cmd.I.A.

transferred to the Naperville in-store branch. *Id.* 4-15, 42. Kapsa was discharged in September 2009 after he was found to have engaged in incentive fraud, i.e., opened "shell accounts" to earn points toward a bonus – which Kapsa admits is an integrity violation. *Id.* 4-15, 56-57, 82-83, 86.

**D.**     **The Significant Variation In How ABMs Spend Their Time**

It is clear from the record that there is wide variation in how ABMs spend their time, including variation in the tasks they perform and in the amount of time spent on exempt tasks. As set forth in detail in Cmd.I.A, the testimony of Kapsa, Ross, the opt-in plaintiffs and many other employees, demonstrates that the variation among ABMs is caused by a range of factors, including whether the ABM worked at an in-store or traditional branch, and:

1) the number of employees that the ABM supervises and the rate of turnover – which impact the percentage of time the ABM spends on personnel-related tasks;

2) the branch's hourly staffing levels – i.e., whether it is understaffed – which impacts the volume of Teller/Banker tasks the ABM may be required to cover;

3) how busy the branch is – which impacts the potential for post-shift work; and

4) the size of the branch, whether there is a BM, the style of the BM, and the competency level of the ABM – which impact what exempt tasks are delegated to the ABM.

By way of illustration, Kapsa alleges he spent 75% of his time performing Teller/Banker tasks, but he admits that his in-store branch was unusually understaffed, and he concedes that traditional ABMs may have had completely different experiences. Kapsa Tr. 8-9, 17-18, 23, 26-27, 60, 65, 124-25, 143-44 & Ex. 2. Indeed, Ross testified that the ABMs at her traditional branch worked almost exclusively in the back office with the BM and rarely came behind the Teller line, and, when they did, it was to complain about something (not to perform Teller tasks). Ross Tr. 20-21, 79-81, 82. Consistent with the divergent experiences of Kapsa and Ross, ABM Senger explains that "in a larger [traditional] branch an Assistant Manager is able to engage in a more managerial role, and spends more time coaching bankers and tellers." Cmd.II.C ¶ 15. Other employees provide similar testimony showing the wide variation among ABMs. Cmd.II.B-I; *see* Cmd.I.A.

## III  **ARGUMENT**

### A.  PLAINTIFFS BEAR THE BURDEN OF SATISFYING THE RIGOROUS REQUIREMENTS OF RULE 23.

The requirements of Rule 23 are demanding, and Plaintiffs bear the burden of satisfying them before the Court can grant certification. The United States Supreme Court has emphasized that the class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[3] Because the named plaintiffs will stand in the shoes of the entire class, the district court must conduct a rigorous analysis to determine if they have met their burden of proof, including showing that the class is homogenous enough on the central issues of liability that the interests of absent class members and defendants will be protected.[4] The district court's task is critically important, because – unlike in a certified FLSA class comprised of opt-*in* plaintiffs – a certified Rule 23 class includes individuals who have indicated no desire to participate in the action, but who will be bound by the results (whether good or bad). The Seventh Circuit also "suggests caution in class certification generally."[5] "[J]udges must resist any temptations 'to alter doctrine in order to facilitate class treatment' because the court must ensure that 'all parties' legal rights may be respected."[6]

Plaintiffs wrongly assert that their burden of proof under Rule 23 is "not onerous," and that "[l]ike most wage and hour class claims," they have "easily established" the requirements. Pl. Br. 2, 4. These assertions ignore long-established Supreme Court and Seventh Circuit precedent. Regardless of the "type of case," even one that (unlike this one) may typically involve "classwide wrongs," a "careful attention to the requirements of Fed. R. Civ. P. 23

---

[3] *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982) (quotation omitted).
[4] *Id.* at 161; *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-77 (7th Cir. 2001).
[5] *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 458 (N.D. Ill. 2009) (emphasis added) (quoting *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 746 (7th Cir. 2008)).
[6] *Id.* at 473 (emphasis added) (quoting *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002)).

8

remains nonetheless indispensable."[7]  To prevail on their motion, Named Plaintiffs bear the

burden of establishing each criteria in Rule 23(a) and all requirements of Rule 23(b)(3).[8]  When

evaluating whether Plaintiffs have met their burden, the district court should <u>not</u> accept as true all

of their unsupported allegations, but rather must determine if they actually have <u>demonstrated</u>

each Rule 23 requirement.[9]  Here, Plaintiffs cannot satisfy the rigorous requirements of Rule 23

for either the ABM or Hourly Class, and the Court should deny their motion.

**B.  PLAINTIFFS CANNOT PROVE ADEQUACY UNDER RULE 23(a)(4)
BECAUSE ROSS AND KAPSA LACK CREDIBILITY AND INTEGRITY.**

"A class representative is like a fiduciary; he or she will be required to honestly look out

for the best interests of all other class members," and those class members will rely on, and

justifiably repose trust and confidence in, that representative.[10]  Due to the nature of this

representative role, this court has recognized that "[a]dequacy of representation is perhaps the

most significant of the prerequisites to a determination of class certification," and the "key to the

integrity of class action litigation . . . in relation to the fair and just resolution of the dispute."[11]

One significant factor for courts evaluating named plaintiffs is their history for trustworthiness

and integrity.  Since only the named plaintiffs' approval is necessary for settlement, it is critical

that the court be convinced of their likelihood to protect absent class members:

> [T]he rights of absent class members, including their day in court, may be
> preclusively affected by the class action.  The lead plaintiff[s] must be trustworthy

---

[7] *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 405 (1977) (emphasis added).
[8] *Falcon*, 457 U.S. at 156; *In re Evanston N.W. Healthcare Corp. Antitrust Litig.*, 2010 WL 1488027, at *2 (N.D. Ill. Apr. 12, 2010) (Lefkow, J.).
[9] *Szabo*, 249 F.3d at 676-77 (explaining that the court "should make whatever factual and legal inquiries are necessary," and often must "make a preliminary inquiry into the merits").  *See also Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 558 (7th Cir. 2003) ("[A] decision to certify a class should <u>not</u> be made [] solely on the basis of the arguments of one party.") (Emphasis added.)
[10] *Pope v. Harvard Bancshares, Inc.*, 240 F.R.D. 383, 390 (N.D. Ill. 2006) (Lefkow, J.).
[11] *Id.*

enough to protect the interests of the class by working to pursue a remedy or settlement that benefits the class as much as it does [themselves] or [their] counsel.[12]

Past credibility and integrity issues can also diminish the strength of the named plaintiffs' individual claims, because while on the stand at trial, a plaintiff with a history of credibility issues will likely be subject to heavy cross examination – a process that can be very damaging, causing the jury bias against the plaintiff and possibly leading to an unfavorable verdict – regardless of whether the remaining class members' claims were meritorious. A class representative's history for truthfulness is therefore indispensable, and a marred history can jeopardize the fortunes of the entire class.[13]

Here, the histories of Ross and Kapsa defeat their ability to act in the best interests of the class or to provide reliable testimony at trial. Kapsa was discharged for outright incentive fraud, which demonstrates his willingness to engage in dishonest behavior for monetary gain. He cannot be trusted to provide truthful testimony here – as to either his hours worked or the alleged practices at his branch – where false testimony may also lead to personal monetary gain. An individual with a history of fraud should not be permitted to act in a fiduciary role. As to Ross's unlikelihood of acting in the best interests of the class, in addition to her proving untrustworthy with accounting for bank currency, Ross conceded at her deposition that she would *not* accept a settlement where class members received money but she did not. Ross Tr. 192. Ross testified further that she was seeking "money" in this case; that to the extent any changes were made in current or future policies, they would not impact her because she has not worked at Charter One for over three years; and she was not sure if she was even a representative for current employees

---

[12]*Id.* (quotation and citation omitted).
[13]*See Searcy v. eFunds Corp.*, 2010 WL 1337684, at *5 (N.D. Ill. March 31, 2010) (decertifying class based on named plaintiff's lack of credibility, reasoning that an untrustworthy plaintiff could reduce the chance of the class prevailing); *Brider v. Nationwide Credit Inc.*, 1998 WL 729747, at *3-5 (N.D. Ill. Oct. 14, 1998) (denying certification based on same reasoning).

in this case, because she did not know current Charter One policies. *Id.* 154, 160.

As if the above were not enough, the deposition testimony of both Kapsa and Ross reveals their willingness to provide false testimony. Kapsa admitted at his deposition that certain assertions he made in his prior sworn statements were either "not entirely" true or were just plain untrue. *See* Cmd.I.C. As just one example, Kapsa had made several assertions regarding "company-wide" practices and "all" Charter One employees in the sworn statements Plaintiffs submitted in support of their motion, but he has retracted them, admitting that his knowledge was actually extremely limited. *See id.* Ross's deposition revealed even more flagrant mistruths. As an initial matter, when shown a copy of her December 11, 2009 sworn statement, Ross stated that she did not even recognize the handwriting; she did not know who had completed it. Ross Tr. 114-15 & Ex. 3. Ross explained further that she had had no input into the content of the questions and had simply spoken to class counsel over the phone. *Id.* 115-16. Not surprisingly, many of her sworn allegations have proved false. Specifically, and as set forth in greater detail in Cmd.I.C, Ross admitted that:

- her sworn statement that her observations applied to "all" employees in her job title was untrue, as she actually did not know the job duties or work hours of any TM but herself;
- despite stating under oath that she had personally overheard regional managers' and other managers' conversations regarding overtime, she in fact had not;
- despite her sworn statement that her manager altered her time records to remove overtime, other than the one time she could recall when her time was changed to correct it and to reflect her actual hours worked, ***she had no evidence that anyone ever changed her time records***; and
- despite stating under oath that Charter One automatically deducted time for her meal breaks, no meal time was actually ever "automatically" deducted; rather, it was Ross who chose not to record certain time that she ended up working during lunch.

Finally, Ross admitted that her Interrogatory Answers, signed under pains and penalties of perjury, contained untruths.[14]

---

[14]For example, her responses stated that she heard branch and regional managers discussing overtime

The false testimony of Ross and Kapsa seriously undermines their credibility, and "evince[s] a willingness to give intentionally false and misleading testimony in an effort to further [her] interests in this litigation."[15] Neither is a credible or adequate class representative. Their history will undoubtedly make them vulnerable to attack at trial and damage the interests of the class as a whole. In fact, whereas the integrity of any named plaintiff is critical, here, it is paramount, because Kapsa and Ross admit that they have no records and must rely solely on their own testimony to support their claims. *See* Kapsa Tr. 178, 205; Ross Tr. 89, 159, 181-82. The Court should not grant either of them the privilege of serving as class representative.[16]

The failure of Kapsa and Ross as class representatives defeats Plaintiffs' motion to certify both the ABM and Hourly Classes.

## C.    THE ABM CLASS SHOULD NOT BE CERTIFIED.

Plaintiffs' motion for certification of the ABM class also fails because Kapsa is not typical of the ABM Class,[17] and Plaintiffs have not, and cannot, show that common issues would predominate in a determination on the merits of their misclassification claims, or indeed that

---

issues, Ross Ex. 10 No. 11, but when reminded that she had testified earlier in her deposition that she had never even seen a regional manager, she was forced to admit that her Interrogatory Response was false, and that she actually had "never heard a regional manager say or suggest in any way," either to herself or to any other employee, that anyone should work hours that they would not be paid for, or that anyone should change time entries in a way that was inaccurate. Ross Tr. 183-88.

[15]*Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (decertifying class based on untruthful deposition testimony by named plaintiff). Just as in *Kaplan*, the fact that class counsel (who prepared the sworn statements and interrogatory responses that have proven false) repeatedly interrupted questioning and instructed Ross not to answer about these matters suggests further complicity. *See, e.g.,* Ross Tr. 117, 121-25. As the *Kaplan* court held, when facing similar conduct: "[A] review of the transcripts has convinced the Court-as it must any neutral observer-that plaintiff's counsel was at least a silent accomplice in, and at most encouraged, plaintiff's false testimony. Plaintiff's counsel should have made defendants aware of the true facts; instead, their comments during the depositions reveal an intent to keep the truth hidden even at the cost of allowing their own client to lie." 132 F.R.D. at 510-11.

[16]*See Pope*, 240 F.R.D. at 390 (holding that when a named plaintiff has a history of conduct that seriously impinges his credibility, "the court cannot grant [him] the privilege of serving as a class representative").

[17]Defendants do not contest numerosity. They do contest commonality, but they discuss the topic only as it applies under Rule 23(b)(3) (*see* Sections C.2 and D.2, *infra*). Because Plaintiffs come nowhere near showing that common issues *predominate*, a determination as to whether they meet the less onerous Rule 23(a) commonality requirement is of no moment.

there is any common proof at all. A class action would not, therefore, be an appropriate vehicle for litigating their claims. The individual discovery and evidence required for each ABM to establish liability on the part of Charter One would destroy the economies of scale envisioned by Rule 23 and make class treatment a woefully inferior method of adjudication.

1. **Plaintiffs Cannot Satisfy Rule 23(a)(3) Because Kapsa's Misclassification Claim Is Not Typical of the ABM Class.**

An individual seeking class certification must prove that his or her claims are typical of the claims of the class such that the class representative will fairly and adequately protect the interests of the class.[18] Kapsa cannot do so, however, because: (1) he worked only in in-store branches; and (2) the one in-store branch where he served as ABM was "chronically understaffed." These facts make his experiences different from the great majority of ABMs.

As noted above, in-store branches make up only 14% of all branches in Illinois, and there are significant differences between in-store and traditional branches that, as Kapsa admits, impact the ABM's job duties and cause variation in experiences. In fact, Kapsa does not even consider himself to be a representative for traditional-branch ABMs in this case. When asked at his deposition for whom he considered himself a class representative, he responded:

> [w]ell technically, I only worked in in-stores. So I would say that from hands-on experience, I could speak for in-store employees, definitely. . .
> * * *
> Speaking for traditional branches, I couldn't say because I never worked at [one].

Kapsa Tr. 148; *see also id.* 14-15, 125-26.

Second, even among the in-store branches, Kapsa's ABM experiences were a-typical. Kapsa testified that: when he joined the branch it was understaffed, with only a BM and two Bankers, whereas it should have had 3-4 Bankers like other in-stores; within a week or two of his

---

[18]Fed. R. Civ. P. 23(a)(3); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997).

arrival, one of the Bankers resigned, and the branch used a "loaner" Banker from another branch; and soon afterwards the one non-loaner Banker resigned, leaving the branch with only three employees: the BM, Kapsa, and the "loaner" Banker. *Id.* 8-9, 17-18, 24-25. Kapsa testified that although this situation was an extreme, generally throughout his entire time in the branch, it was "very rarely" fully staffed. *Id.* 18, 93, 230. This alleged chronic understaffing was likely why Kapsa spent a large portion of his time performing Teller/Banker functions (if true), and why he did not spend a greater portion of time supervising. The understaffing (which Kapsa testified was <u>unlike</u> the other branch where he worked, which was almost always fully staffed), means that Kapsa's experiences were not typical of even in-store ABMs. *See id.* 18-19, 154.

## 2. <u>Plaintiffs Do Not Satisfy Rule 23(b)(3) for the ABM Class.</u>

Plaintiffs' motion also fails due to their inability to satisfy Rule 23(b)(3). Rule 23(b)(3) requires plaintiffs to show that common issues predominate over individualized ones, and that a class action is the superior mechanism to adjudicate their claims.[19] The Seventh Circuit has directed that when evaluating the propriety of class certification, the district court must evaluate the path a court or jury will need to take to decide the merits of class members' claims, <u>to make sure that common evidence can be used to establish liability for each class member</u>.[20] In other words, the court must examine "the substantive elements of plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues."[21] The inquiry requires an assessment of the degree to which common proof will govern and the degree to which resolution of class-wide issues will advance the claim of each individual class member.

---

[19]The predominance and superiority prongs of Rule 23(b)(3) are independent but related, and where, as here, common issues do not predominate, superiority is also not satisfied because individualized issues mean a class action would be inefficient and unmanageable. *See Walker v. Bankers Life & Cas. Co.*, 2008 WL 2883614, at *12 (N.D. Ill. July 28, 2008) (Conlon, J.) (citing *Amchem Prods.*, 521 U.S. at 615).
[20]*See Puffer*, 255 F.R.D. at 458 (quotation omitted) (citing *Szabo*, 249 F.3d 672*).
[21]*In re Evanston Northwestern Healthcare Corp. Antitrust Litig.*, 2010 WL 1488027, at *8 (N.D. Ill. Apr. 12, 2010) (Lefkow, J.) (emphasis added).

To meet their burden of proof, the plaintiffs seeking certification must present "affirmative evidence to demonstrate that there is a method of proving class wide" liability.[22]

Plaintiffs' submissions in support of Rule 23(b)(3) certification here, however, are conclusory and unsupported. They present no affirmative evidence to demonstrate that there is a method of proving class-wide liability on their ABM misclassification claims. Plaintiffs' motion is premised solely on the fact that Charter One had a uniform policy of classifying ABMs as exempt. Pl. Br. at 2-3. It is well established, however, that an employer's uniform classification scheme is insufficient to satisfy Rule 23(b)(3). As the Ninth Circuit held in *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, where it overturned a district court's class certification order, the existence of a "blanket exemption policy" "does nothing" to facilitate the common proof required to make misclassification claims suitable for class treatment under Rule 23.[23]

Moreover, in a misclassification case like this one – where there is no common employer directive as to how an ABM should spend his or her time or how much time to spend on exempt tasks, and where the evidence shows significant variability among ABMs in terms of how they in fact spend their time, Cmd.I.A. – a determination on the merits would involve solely individualized issues. Specifically, a finding would need to be made as to what tasks each ABM actually performs and the relative importance to the ABM's overall function that exempt and non-exempt tasks play. As the Seventh Circuit has held, in an FLSA misclassification decision upholding summary judgment for an employer, courts must engage in a case-by-case analysis of

---

[22] *Id.*, 2010 WL 1488027, at *32.

[23] 571 F.3d 953 (9th Cir. 2009). Nor do the sworn statements of three ABMs (including Kapsa), that they spent a majority of time on non-exempt tasks, *see* Pl. Ex. A, suffice as class-wide evidence. The boilerplate assertions therein that purport to extend declarants' experiences to "all" ABMs, have not survived deposition questioning, rendering the statements irrelevant except with respect to the three individuals' claims and the handful of others about whom they purport to have first-hand knowledge. *See* Cmd.I.C, I.D, I.E. The statement of a fourth ABM, Tiffany Epps, should be disallowed altogether because she withdrew from the case and refused to be deposed. *See* Epps Tr. 3-5.

the employee's duties and responsibilities" because the overtime exemptions turn on "how employees spend their day."[24]

Because of the case-by-case inquiry required for determining exempt status, courts have regularly held that Rule 23(b)(3) certification is simply not appropriate for misclassification cases. There is no common evidence (much less a predominance of such evidence) that can be used to advance all class members' claims. The court in *Spainhower v. U.S. Bank Nat'l Ass'n*, for example, denied Rule 23(b)(3) certification in a case where "in-store bank managers" asserted misclassification.[25] The court reasoned that before any individual plaintiff could prevail, there would have to be an inquiry into the applicability of the executive, administrative, and outside sales exemptions that arguably applied, and such inquiry would require "an individualized analysis of the way each employee actually spends his or her time, and not simply [a] review [of] the employer's job description," making certification improper.[26]

---

[24]*Roe-Midgett v. CC Servs.*, 512 F.3d 865, 868-70, 872 (7th Cir. 2008) (citing 29 C.F.R. § 531.205(d)). *See also Piscione v. Ernst & Young L.L.P.*, 171 F.3d 527, 537-46 (7th Cir. 1999) (analyzing plaintiff's deposition testimony on his actual duties and finding he was properly classified, explaining that just because employees have same job title does not necessarily mean they are all exempt or nonexempt).
[25]2010 WL 1408105, at *3 (C.D. Cal. Mar. 25, 2010).
[26]*Id. See also Edwards v. Publishers Circulation Fulfillments, Inc.*, 2010 WL 2428083 (S.D.N.Y. June 16, 2010) (denying Rule 23 certification because plaintiffs could not prove that employer had a common unlawful misclassification policy; there was no common evidence that would establish all plaintiffs' claims; and plaintiffs' testimony could not prove liability for any other class member because they spoke almost entirely on their own experiences, which they could not show applied uniformly to the class); *Odem v. Centex Homes*, 2010 WL 424216 (N.D. Tex. Feb. 4, 2010) (denying motion for FLSA certification post- discovery where evidence showed that the duties of the managers who claimed misclassification differed widely based on location, manager, and time period); *Novak v. Home Depot U.S.A., Inc.*, 259 F.R.D. 106 (D.N.J. 2009) (denying Rule 23 certification in a misclassification case due to variations among plaintiff-managers as to their actual duties); *Oetinger v. First Residential Mortgage Network, Inc.*, 2009 WL 2162963, at *3 (W.D. Ky. July 16, 2009) (denying certification, reasoning that to assess applicability of administrative and executive exemptions (which would be necessary before determining if any plaintiff could prevail), court would have to "go through an individualized appraisal of the employee's duties and responsibilities"; court reasoned that the lack of a company-wide policy on precisely what work and how much should be done meant that each plaintiff's claim would arise from the type of work individual managers decided to have each plaintiff perform); *Bunyan v. Spectrum Brands, Inc.*, 2008 WL 2959932, at *9 (S.D. Ill. July 31, 2008) (denying FLSA certification, concluding that the employees' location, shift, and production line created differences in nature of work performed, and the

In contrast to the overwhelming weight of authority militating against certification here, the <u>sole</u> case Plaintiffs cite in support of their motion to certify an ABM class under Rule 23(b)(3), *see* Pl. Br. 8-9, <u>was actually superceded the very next year</u>, when it became clear that individualized issues predominated and a class action would be unmanageable.[27] Trying *this* case in a class action vehicle would be similarly unmanageable, and Plaintiffs have done nothing to prove otherwise. Indeed, Defendants posed written Interrogatories asking that Plaintiffs identify a plan for trying this case on a class-wide basis; they objected and provided no response. *See* Kapsa Ex. 10, Nos. 9, 11, 13, 14. The Court should follow the vast majority of cases that have denied Rule 23(b)(3) certification in misclassification cases like this one, where Plaintiffs have presented no common proof that could be used to advance class members' claims. Because Plaintiffs do not satisfy the Rule 23 requirements, their motion should be denied.

**D. THE HOURLY CLASS SHOULD NOT BE CERTIFIED.**

Plaintiffs also fail to satisfy the requirements of Rule 23 for the Hourly Class. Unable to challenge Charter One's official overtime policy – which Plaintiffs concede is lawful – Plaintiffs resort to a claim that there was an unofficial, unwritten, "verbal" policy to deny overtime, and that hourly employees therefore worked "off-the-clock." *See* SAC ¶¶ 1, 2; *see id.* ¶ 24; Kapsa Tr. 39-42. Plaintiffs allege that this work occurred through various mechanisms, depending on the individual, and they seek to have a uniform liability determination made for all class

---

time spent on non-exempt tasks varied, meaning court would "have to consider the individual circumstances of each Plaintiff"); *Austin v. Cuna Mut. Ins. Soc'y*, 240 F.R.D. 420, 429 (W.D. Wis. 2006) (denying certification, because to decide exempt status, "the court looks at the actual day-to-day job activities"); *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1013 (N.D. Ind. 2005) (denying certification where misclassification claims would "require a highly individualized, fact-specific inquiry"; determining how plaintiffs spent their time was not governed by bright line rules, but specific facts).
[27] *See Walker v. Bankers Life & Cas. Co.*, 2008 WL 2883614, at *9, 10 (N.D. Ill. July 28, 2008) (holding that "resolving the common issue of misclassification would require an onerous inquiry," "it has become apparent that common questions will not predominate," and "[l]iability determinations would be individual and fact-intensive, rendering class certification under Rule 23(b)(3) improper").

members in one case. Named Plaintiffs' own testimony, however, demonstrates that there is no uniform unwritten policy alleged. Rather, Plaintiffs allege innumerable different unwritten policies that depended on: (1) the branch; (2) the BM or ABM (and sometimes the Regional Manager) who was allegedly dictating such policies; (3) the particular job position of the particular individual hourly employee; (4) the particular time period involved; (5) the staffing levels of the particular branch; and (6) a variety of other circumstances, including the events that transpired on any particular day. These circumstances preclude Plaintiffs from demonstrating both typicality under Rule 23(a)(3) and predominance/superiority under Rule 23(b)(3).

1. **Plaintiffs Do Not Satisfy Rule 23(a)(3) Because Neither Ross Nor Kapsa Has Claims Typical of the Hourly Class.**

Even if Ross or Kapsa were subject to any overtime violations, neither can show that his or her individual claims are typical of any other Hourly Class member.

**Ross.** Ross's employment experiences were characterized by numerous distinguishing features that render her claims a-typical of the Hourly Class. <u>First</u>, the branch where she worked was itself a-typical. Ross termed it a "mega" branch because it was one of the largest branches in the state with "lots and lots of customers where the line stayed long all day long." Ross Tr. 76. Ross explained that employees' experiences in her branch contrasted sharply with those in other branches where "you walk in and everybody is sitting around all happy with nothing to do, waiting for a customer. This branch was busy all day long." *Id.* <u>Second</u>, as a TM (a position that makes up less than 10% of the Hourly Class[28]), Ross's duties differed from other Hourly Class members (i.e., the more numerous Tellers and Bankers). Cmd.I.B. These differing TM duties, Ross testified, resulted in her having unusually long work hours – which hours form the

---

[28]This percentage is based on the fact that there was generally only one TM per traditional branch, and no TMs in any in-store branches. *See* Kapsa Tr. 18, Ross Tr. 106-07; Cmd.II.A.

basis for her unpaid overtime claims. *Id.* Specifically, Ross claims that she incurred hours that she did not record (to the extent they brought her over the generally permitted 41-42 total hours per week), and that those hours were spent performing TM duties that were not required of any other hourly employees at her branch. *Id.; see also* Ross Tr. 169-70. These hours included TM tasks performed: (1) before her scheduled shift, opening the branch each morning; (2) during unpaid lunch breaks; and (3) after her scheduled shift, helping Tellers balance their drawers and closing the branch. Cmd.I.B. The uniqueness of Ross's claims makes them different than those of the class. Third, Ross is a-typical because her employment terminated on February 10, 2007 (less than four months into the class period). Ross specifically disclaims any knowledge as to policies or overtime violations at her branch after her discharge. Ross Tr. 59. Significantly, Ross's employment ended before the Bank's conversion to the timekeeping system in 2008 under which employees receive an e-notice if a manager alters their recorded hours and may reject the hours report. Based on all of these factors, Ross cannot show that her claims are typical of the remainder of the Hourly Class.

**Kapsa.** Kapsa had similarly distinctive employment experiences that render his "off-the-clock" claims a-typical of other Hourly Class members. First, Kapsa only worked as a Banker at in-store branches (similar to 14%, at most, of all Bankers), meaning that he had different job duties and experiences than the great majority of the Hourly Class. In fact, ***Kapsa does not even claim to speak for any traditional Bankers in this lawsuit.*** Kapsa Tr. 125-27. He hardly can be their official representative. Second, Kapsa had chronic tardiness and absentee issues while a Banker. Kapsa's development plan for 2009 indicates that in the five months before his discharge, he was tardy or left early at least ten times, and he was sometimes 90 minutes late for his shift. *Id.* Ex. 1. These facts make Kapsa's work hours and experiences different than most

other class members. Even Ross concedes that an hourly employee with chronic tardiness issues would be unlikely to have worked overtime hours. *See* Ross Tr. 114. <u>Third</u>, Kapsa was only a member of the Hourly Class for less than a year and a half. The remainder of the class period he was an ABM or a part-time Banker (who admittedly never worked overtime). Kapsa was also discharged in September 2009, and he admittedly has no knowledge of overtime policies or experiences of employees at Charter One after he left. Kapsa Tr. 228-29.

Thus, the Court should conclude that Plaintiffs have failed to meet the typicality requirement of Rule 23(a)(3), and their motion should be denied.

### 2. **Plaintiffs Cannot Satisfy Rule 23(b)(3).**

Plaintiffs also fail the predominance and superiority tests of Rule 23(b)(3). It is beyond doubt that Plaintiffs are not challenging any universal unlawful policy on which class-wide liability could be premised. By way of illustration, Kapsa states that when he was serving as the "Acting Branch Manager" at the St. Charles branch, throughout the fall of 2006, his Regional Manager (Kathy Schubert) instructed him to schedule overtime, and such overtime was recorded and paid for. *See* Kapsa Tr. 92-93, 183-84, 186. By contrast, at Naperville where Kapsa was a Banker in 2009, his manager allegedly permitted no overtime under any circumstances. *Id.* 57; *see also id.* 183-84. As the branch was usually fully staffed, however, and as he was often late to, or absent from, work, Kapsa rarely worked overtime. *Id.* 198-99, 203-04.

Ross's experiences differed from Kapsa's at both his branches – further demonstrating the lack of commonality in any challenged unofficial overtime policy. At Ross's branch, the policy was allegedly that 1-2 hours of overtime were permitted, and paid for, each week – establishing yet a third alleged unwritten policy based on the branch. Ross Tr. 169-70. Ross alleges, however, that she worked more than that because of tasks imposed on her due to her unusual TM position at a mega branch, that were not imposed on the other hourly employees,

Cmd.I.B – thereby establishing that the alleged unwritten overtime policies sometimes depended on the position of the Hourly Class member.

The differing testimony of Kapsa and Ross demonstrates that the experiences of the hourly workers were driven by the branch where they worked, the job position they held, and/or the discretion of the different managers who supervised them. There was no uniform unlawful policy with respect to overtime that was applicable to all class members. Indeed, there were many class members who attest that at their branches all overtime was paid for, and they were never denied any overtime pay. *See* Cmd.I.E.

In this type of situation, to prove liability, Plaintiffs would have to demonstrate, and the Court would have to examine, an overwhelming number of individualized issues and an overwhelming volume of individualized evidence. For each individual class member, for each work week during the three-year class period, there would necessarily be an examination of:

- whether the individual recorded all time worked that week and, if not, why not[29];
- whether the individual worked over 40 hours that week and, if so, whether he or she was paid for some or all of that time[30];
- whether the individual's manager directed the performance of such work or was even aware that the individual was working time that was not recorded[31];

---

[29]Opt-in plaintiff Rowe, for example, responded "sometimes I did and sometimes I didn't" when asked, "why didn't you record all the hours that you were working?" Rowe Tr. 40.

[30]Kapsa, for example, testified that there were many weeks when he did not work any overtime or was paid for the overtime he worked. Kapsa Tr. 198-99, 203-04.

[31]The FLSA requires plaintiffs to demonstrate that they were 'employed' by a defendant during the periods of time for which they claim unpaid compensation. *See* 29 U.S.C. § 207(a)(1). Plaintiffs "must show that defendants knew or should have known of [their] overtime work." *Cerbu v. Chicago Bldg. Servs., Inc.*, 1999 WL 438905, at *2 (N.D. Ill. June 22, 1999) (summary judgment for defendant due to manager's unrebutted testimony that he did not know plaintiff was working uncompensated overtime). Here, Plaintiffs cannot use common evidence to prove that their managers always knew when they were working off the clock. At least one plaintiff has affirmatively admitted that her manager did not always know. *See* Rowe Tr. 92, 93. *See Helm v. Alderwoods Group, Inc.*, 2009 WL 5206207 (N.D. Cal. Dec. 29, 2009) (denying certification where individual inquiry was required to determine if a given manager knew that a given employee worked during unpaid meal breaks).

- whether, if the individual *did* record all time worked that week, the individual's manager changed the time to remove overtime, and, if so, whether the change was lawful (to correct inaccuracies), or unlawful (to remove overtime hours that were in fact worked)[32]; and

- whether the amount of any unrecorded time, or any manager-eliminated time, was *de minimis* so as not to be compensable.[33]

All of these determinations are necessarily individualized.

To prevail in each of these determinations, moreover, the individual employees will have no ability to rely on documents. Off-the-clock work is, by definition, unrecorded, meaning that there is no documentation as to whether or when it occurred. In the event that an individual class member kept personal records as to the days or weeks during which there was unrecorded work time, that individual could rely on such records to try to prove his or her individual claim. But those records would do nothing to prove any other class member's claim. Ross and Kapsa, moreover, have both admitted that they did not keep any such records, and the only way either can establish liability is through personal testimony – a circumstance that is likely to be true for the vast majority, if not all, of the Hourly Class. Ross Tr. 182; Kapsa Tr. 205; *see also* Rowe Tr. 95. Additionally, after each such individual (in a class estimated to be larger than 1,000) provided such testimony, it would likely be challenged by the individual's manager, which in turn might be bolstered (or contradicted) by testimony from one or more of the employee's coworkers. If certified, this action would undoubtedly devolve into a series of fact-intensive mini-trials – precisely the situation that the rigorous requirements of Rule 23 are intended to

---

[32]Plaintiffs have admitted that their time was often altered appropriately to correct it. *See* Rowe Tr. 61-64 (explaining that: she received an e-notice every time a manager altered her time submissions, that those alterations were for situations such as when she had forgotten to clock out at the end of the day or had forgotten to clock in after lunch; and she never had any issues with the alterations); *see also* Kapsa Tr. 66-67 (explaining that the only reason he could remember for his time being altered was in connection with his manager's recoding personal time to sick time, in accord with Bank policy); Ross Tr. 132-33 (providing similar testimony).

[33]*See* 29 C.F.R. 785.47 ("insubstantial or insignificant periods of time beyond the scheduled working hours" are considered "de minimis" and not compensable). As Rowe testified, sometimes she worked beyond her scheduled work hours, but sometimes it was only for 3-4 minutes. Rowe Tr. 39.

avoid. It is no wonder that Ross refused to answer an Interrogatory calling for a trial plan. *See* Ross Ex. 10, Nos. 10, 16.

Plaintiffs' conclusory assertion that they satisfy Rule 23(b)(3) for the same reason they satisfy the "not onerous" commonality requirement of Rule 23(a), (Pl. Br. 11), could not be farther from accurate. As this Court itself has emphasized:

> Although related to Rule 23(a)'s commonality requirement, "the predominance inquiry is far more demanding . . . the plaintiff must show that common issues not only exist but outweigh the individual questions."[34]

Here, however, there are no common issues at all. Plaintiffs have not presented a shred of common proof that could be used to advance the case of all class members. Even if Plaintiffs can find one, two, or dozens of common issues associated with some sub-groups of the class at some branches (they cannot), those issues certainly do not outweigh the individual questions associated with determining each individual class member's liability.[35]

Courts facing similar class claims have routinely held that there are too many individualized issues for plaintiffs to meet their burden of proof under Rule 23(b)(3). In *Mateo v. V.F. Corp.*, for example, the court denied a motion for Rule 23(b)(3) certification in a similar

---

[34] *In re Evanston*, 2010 WL 1488027, at *8 (N.D. Ill. Apr. 12, 2010) (citation omitted).

[35] Nor do Plaintiffs cite any applicable authority that supports their burden under Rule 23(b)(3). None of Plaintiffs' cases involved any analysis of the individualized issues present in this type of off-the-clock case. (*See* Pl. Br. 11-15.) *Jonites v. Exelon Corp.* involved an <u>official</u> policy of not paying for "call out" time. 2006 WL 2873198, at *3 (N.D. Ill. Oct. 4, 2006). Plaintiffs here do not challenge Charter One's official overtime policy. *Jonites* does not support their motion. The Rule 23(b)(3) analysis in *Barragan v. Evanger's Dog and Cat Food Co.*, involved the potential impact of a past criminal destruction of the employer's employment records. 259 F.R.D. 330, 334 (N.D. Ill. 2009). It argued that the lack of records would make it impossible for plaintiffs even to prove employment status without individualized proof. The court held that such individualized issues did not involve the heart of the claims of unlawful behavior and were insufficient to deny certification. That holding has no bearing here. The Rule 23(b)(3) analyses in the remaining four hourly overtime cases Plaintiffs cite, (*Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2000 WL 1774091 (N.D. Ill. Dec. 11, 2000); *Yon v. Positive Connections, Inc.*, 2005 WL 628016, at *4 (N.D. Ill. Feb. 2, 2005); *Acosta v. Scott Labor LLC*, 2006 WL 27118, at *2 (N.D. Ill. Jan. 3, 2006); *Hernandez v. Gatto Indus. Platers, Inc.*, 2009 WL 1173327 (N.D. Ill. 2009)), have no relevance; their Rule 23(b)(3) analyses addressed whether a class action is superior for litigating hybrid IMWL/FLSA claims; Charter One does not oppose certification on that basis.

off-the-clock case, where plaintiff claimed that "due to lack of minimum staffing" at her

particular store, "employees had to continue working after clocking out for meal periods."[36] The

court reasoned that among other individualized issues, to prove her claim, the plaintiff

> would need to demonstrate that: (1) she did in fact work off-the-clock, (2) she
> worked because a supervisor instructed her to do so and not because she decided for
> her own reasons to work through the break, (3) the instructions were based on a
> corporate practice and were not made by the supervisor in opposition to corporate
> policy . . . and [(4) she was not paid for the time].[37]

The court reasoned further that each class member would need to go through a similar inquiry

with similar individual evidence to establish liability. The court rejected plaintiff's argument

that those inquiries went to damages only, and it distinguished the cases plaintiff cited,

emphasizing that because plaintiff alleged an <u>unwritten</u> unlawful practice (as is alleged here), as

opposed to a written formal policy, there would be a predominance of individual issues before

liability could be shown, and certification was inappropriate. Numerous other cases have

reached the same conclusion.[38] The Court should similarly decide here that there are too many

individual issues to permit class certification.

---

[36] 2009 WL 3561539, at *6 (N.D. Cal. Oct. 27, 2009).

[37] *Id.*

[38] *See, e.g., Burkhart-Deal v. CitiFinancial, Inc.,* 2010 WL 457122 (W.D. Pa. Feb. 4, 2010) (denying Rule 23 certification for "off-the-clock" claims, where it was undisputed that the company's formal, written policies required payment of overtime and required employees to accurately record all hours worked; court reasoned that because plaintiffs only claimed that overtime requests were granted infrequently [not never], overtime was not "uniformly denied," as would be necessary to show that common evidence could prove all class members' claims; instead, each plaintiff's claim could only be proven with individualized evidence, making the class certification improper); *Helm v. Alderwoods Group, Inc.,* 2009 WL 5206207, at *11 (N.D. Cal. Dec. 29, 2009) (denying Rule 23 motion where plaintiffs claimed they "were required or permitted to work" without pay, were otherwise directed "not to record all their work time," and/or had their timesheets "altered . . . to reduce the number of hours worked"; court held that "individualized inquiry" would be "required to determine whether a given manager was aware that a given employee worked" during unpaid meal breaks, "whether any managers altered time cards to exclude time spent working during meal breaks," "whether individual managers were aware that their employees worked off-the-clock, whether these managers encouraged or directed employees not to record that time, and whether any managers altered time cards that did reflect pre- and post-shift work"; therefore, "individualized issues would overwhelm any common issues presented," meaning that plaintiffs' claims were "not amenable to classwide proof"); *In re Wal-mart Wage and Hour*

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court deny

Plaintiffs' motion and decline to certify either the ABM or Hourly Class.

Respectfully submitted,

**RBS CITIZENS, N.A., & CITIZENS**
**FINANCIAL GROUP, INC.**

By:     PROSKAUER ROSE LLP                                    Dated:  June 30, 2010
     _/s/ Catherine J. Spector_
Nigel Telman (Ill. Bar No. 6216939)                    Elise M. Bloom*
Catherine J. Spector (Ill. Bar No. 6287459)            Amanda D. Haverstick*
Three First National Plaza                             Jacqueline Dorn*
70 West Madison, Suite 3800                             1585 Broadway
Chicago, IL 60602-4342                                 New York, NY 10036
Tel: 312.962.3550                                      Tel:  212.969.3000
Fax: 312.962.3551                                      Fax:  212.969.2900
ntelman@proskauer.com                                  ebloom@proskauer.com
cspector@proskauer.com                                 ahaverstick@proskauer.com
                                                       jdorn@proskauer.com

Mark W. Batten*
Alison Langlais*
One International Place                                 *Admitted _pro hac vice_
Boston, MA  02110
Tel: (617) 526-9600                                    _Attorneys for Defendants_
Fax: (617) 526-9899
mbatten@proskauer.com
alanglais@proskauer.com

---

_Employment Practices Litig._, 2008 WL 3179315 (D. Nev. June 20, 2008) (denying class certification where the action would amount to mini trials for each class member and each instance of alleged time shaving); _Diaz v. Electronics Boutique of Am., Inc._, 2005 WL 2654270, at *5 (W.D.N.Y. Oct. 17, 2005) (denying Rule 23 certification because plaintiffs' claims of time sheet alteration were too individualized). Courts have also decertified or refused to certify FLSA classes in off-the-clock cases based on the same reasoning. _See, e.g., Velasquez v. HSBC Fin. Corp._, 266 F.R.D. 424 (N.D. Cal. Feb. 18, 2010) (denying a post-discovery motion for FLSA certification in an "off-the-clock" case, reasoning that fact that overtime was in fact paid for on occasion, undercut their claim of a uniform policy to deny payment for all time worked); _Saleen v. Waste Mgmt., Inc._, 649 F. Supp. 2d 937 (D. Minn. 2009) (denying certification in FLSA hourly class claim under same reasoning); _Adair v. Wisconsin Bell, Inc._, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) (denying FLSA certification, reasoning that "Plaintiffs have provided no facts to suggest that supervisors, other than their own, observed employees working outside their scheduled tours and permitted such conduct," and that "alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan, are not appropriate for collective treatment").

25

## CERTIFICATE OF SERVICE

I, Catherine J. Spector, an attorney, do hereby certify that I have caused a true and correct

copy of the foregoing to be served to the following attorneys, today June 30, 2010, by operation

of the Court's CM/ECF electronic filing system:

Kenneth C. Apicella
Apicella & Malatesta LLC
134 North LaSalle
Suite 320
Chicago, IL 60602
312-445-0542
312-261-9968 (fax)
kca@theamfirm.com

Daniel W. Craig
Daniel W. Craig, P.C.
1125 Grand
Suite 900
Kansas City, MO 64106
(816) 221-7772
dcraig@dancraigpc.com

Brendan J. Donelon
Donelon, P.C.
802 Broadway
7th Floor
Kansas City, MO 64105
(816) 221-7100
brendan@donelonpc.com

Robert Andrew Santillo
The Winebrake Law Firm, LLC
Twining Office Center, Suite 211
715 Twining Road
Dresher, PA 19025
(215) 884-2491
asantillo@winebrakelaw.com

By:     */s/ Catherine J. Spector*
      Catherine J. Spector